May it please the court, counsel, good morning. Your Honor, this is an appeal from an immigration conviction on a smuggling case out of the Southern District of Texas in which the defendant, Ms. Muniz, was given 85 months in prison. The deceased, Juan Tovar, who was smuggled into the country by Ms. Muniz, was deported in 2010 and was smuggled back into the country in on August 17th and August 18th of 2010 by Ms. Muniz and her co-defendant, Luis Acetuno. Ms. Muniz had come from Los Angeles along with Acetuno with a van, picked up Mr. Tovar and a couple others and were traveling from Houston back to the city of Los Angeles in California. Mr. Tovar, the deceased, actually lived in the city of Seattle with his wife and children. On the way, it was made evident to Ms. Muniz that Mr. Tovar was sick. They said he looked ill, he was taking off a shirt, putting it back on, he had hot spells, cold spells. Ms. Muniz, my client, ended up getting him some water and some Gatorade. Some telephone calls were made to Mr. Tovar's wife in Seattle where there was a mention that he needed serum which, when she testified at trial, the wife, that she meant that by that fluids or Gatorade, she eventually did say that he was diabetic and needed some insulin for that. Now, Ms. Muniz never did get any insulin. It is believed that Mr. Tovar died in the van on the way from Houston to Los Angeles. Ms. Muniz, after calling someone, her boss, I guess it would be, in California, was told to just leave the body on a roadside park in Vega, Texas, about 30 miles outside of Amarillo. The government's contention is that he may have been alive before he was placed at that roadside stop. It is the defense's standpoint, the appellant's standpoint, that he died in the van based on the fact that there was evidence from Mr. Asituno, the co-defendant who testified against Ms. Muniz. How many hours did he spend in transport? From Houston to Amarillo, it was probably five or six hours in transport to that point before he died. I thought it was longer. It may have been an hour or so longer, but probably not any more than that, Your Honor. So you're talking about two enhancements here? Excuse me? You're saying two enhancements, the B-6 and the 7-D, were improperly applied? Yes, that's correct, Your Honor. After the jury found her guilty of this, the judge increased the sentence six points because she believed that Ms. Muniz had recklessly created a substantial risk of serious bodily injury by not taking Mr. Tovar either to a hospital or a clinic or going to a... Reckless endangerment's a six-level increase, or is it a two-level? Was that a six-level? It would be a two-level increase, Your Honor, unless it starts out at a 12. I see. And in this particular case, since the original level was a 12, Judge Rosen... She testified at trial. That's correct, Your Honor. And the district court ultimately, in sentencing, applies obstruction of justice, claiming that her denials were false? Yes, the judge believed that she lied. That's right, Your Honor. Lied to the FBI that came out to her house in California, because she was denying hardly any knowledge... Is that the only basis? I thought he also gave those extra obstruction of justice enhancements because she denied under oath at trial that she'd called the wife the widow now of... That's correct as well. That's a significant second basis, because that's part of her claim that she couldn't have recklessly endangered him because she's driving along, just opening up windows, shutting windows, and then he's dead. That's her version. Yes, Your Honor. But the court finds that false, so you can infer from the false denial that she knew he was very sick. She didn't just discover him dead, and that would be enough of a basis right there. That could be, Your Honor, but I would disagree from the evidence that the obstruction had more to do with her saying that she didn't communicate with the widow about the insulin. Or the diabetes, right? Excuse me? Didn't she deny that the wife told her he was a diabetic? Yes. She tried to say those calls didn't even happen. She knew nothing about him. It was the other woman in the van. Yes, that there was another woman in the van that made those particular... Once the court not only discredits that, but gives obstruction of justice for that sworn testimony, then why isn't it a fair basis for this court who has watched her demeanor to say, I don't believe her that she just found out he was dead at the last minute and had no idea until then. And once that happens, then her admission she didn't call 911, she didn't stop at any doctor, would look to me like it meets... It's a lot more than the case you rely on, Gomez. Well, yes, Your Honor, but even though... And there's no doubt that this person is callous, that Ms. Meese is callous, but the fact that she lied about a telephone call to the widow about the insulin and lied to FBI agents that came out to her house still doesn't go to the heart of the matter was the fact that she disregarded that of such a measure that it's a substantial risk of serious bodily injury. Your Honor, from the defense, the fact that someone looks ill and that someone would need diabetic medication, she was going from Houston to Los Angeles with this Mr. Aceteno. So between their switching driving, they could be in LA within a couple of days. If she had some type of community college nursing training, the fact that you could be there within a couple of days, Your Honor, I would submit, would say that she did not think that he was going to be dying right there on that trip in the next day to day and a half, that he could have made it to LA where maybe medical treatment could have been given to him at that time. So even though she did lie to the FBI, she lied on the witness stand, or at least the judge found that she lied on the witness stand and obstructed justice, it still doesn't go to the heart of matter of whether or not there was, she created substantial risk of serious bodily injury by not taking this man to a doctor, a clinic, Walmart, anything else like that to get them to get the insulin. I guess I understood her argument. I didn't take him anywhere because by the first time I knew it, he was just dead. That's correct. But if you don't credit that, then her argument, you know, that she couldn't have done anything except leave him in front of trailers and, you know, trailer vans, whatever they were, cars, just the body on the road, it seems like that decision would be recklessly endangering him. But I understand your argument. And Your Honor, you can also take a look at this. The government relied upon the evidence of the at least his direct testimony was that it was his impression that when they unloaded Mr. Tovar at the roadside park in Vega, Texas, it was his impression that he, though unconscious, was still alive. But under cross-examination, he did admit he didn't know if he was alive or dead. And so because of the fact that upon cross-examination, a government witness is going to say, you know, I really don't know whether or not he's alive or dead. It still goes to the government to prove by preponderance of the evidence that Mr. Tovar died after they unloaded him from that van and not just on the way, because it still supports our theory of the defense that if he just died on the way there, just looking ill, that someone could have gotten insulin when he finally got to Los Angeles and tried to get the trip over with and trying to stop everything at that time, that she did not think that she was putting him in such a substantial risk of serious bodily injury that they couldn't have waited another day or two, that it was not such an emergency that they had to get to a doctor or a hospital or clinic or something right there at that time. He was totally acting erratically. I mean, he's taking his shirt off, taking his shirt off, putting it back on, saying he's hot, saying he's cold. That's not normal. That's correct, Your Honor. So, I mean, she didn't want to stop, obviously, because she didn't want the carload of aliens to be discovered. That's correct, Your Honor. And while it's not normal to be taking your shirt off, putting it back on, having the sweats, being cold, being hot, I mean, she did try to do something by going to... Gatorade? That's not going to help a diabetic. Excuse me? She got him some Gatorade, right? That's correct. Well, that is true. That is not insulin that was not going to help his diabetes at all whatsoever. But again, this is the B6 of 2L1.1 is whether or not she created a substantial risk of serious bodily injury or death. But then... Do you credit that if you, as the district court did, if you believe that she was told he needs medicine and then she chooses not to get it? That's pretty close to the illustration supporting, you know, the amended illustrations. It's basically abandonment, non-given, you know, no medical care. But anyway, why don't you move to the C, what is it, the 7D? 7D, Your Honor. This is, the previous one was a six-point enhancement from 12 to 18. This takes it from 18 to 28 because of the fact that... She ended up getting how much time? 85 months, Your Honor. 85 months, which is a slight downward, what I think of as a downward departure. Yes. And I think Judge Rosenthal did that because of the fact this didn't fit the normal coyote trafficking of aliens by putting, you know, just a huge amount into a van where it's not air-conditioned and they die of heat prostration or they're crossing the South Texas desert or the Arizona desert and they're not giving them proper food, water, you know, to be able to handle that type of heat and terrain over several days. But, Your Honor, this court has said that in Ramos Delgado, which was decided just last year, that y'all are going to, this court's going to side with the circuits that have said that it's a but-for test, not a causation test. And just from the defense, we would ask you to reevaluate that, Your Honor, that since death is the ultimate, I mean, he died, there could be nothing more serious than that, that you would look at this as more than just strict liability of a but-for, but actually look at causation that were decided by the Eighth and Ninth Circuits, that this man died of low-bar pneumonia. Now, it was aggravated by his diabetes, as the doctor, medical examiner, Dr. Parson said. It was aggravated by the diabetes. It was also aggravated by hardening of the arteries. But the main cause of death was pneumonia. So, this man was sick, very sick, when Ms. Menice got him in Houston and put him in this minivan. And it is our contention, Your Honor, that whether he was driving in this minivan to Los Angeles or whether or not he just spent the night in Houston for the next couple days, that he was, without any type of should not have been added to my client's total. Two problems that I see with that is, one, you have a special jury verdict saying that her conduct resulted in death, which, why doesn't that just control the enhancement right there? It is certainly true, Your Honor, that the jury came back and said that Ms. Menice put his life in jeopardy, and as a result of that jeopardy, that the judge still has to make a decision based on that on whether or not, you know, because that's not saying whether or not it was a substantial risk of serious bodily injury or death. Yes, I guess she put her, his life in jeopardy by transporting him. If your conduct results in death, how wouldn't that control? I don't see how the district court didn't rely on that. I don't see how it could have deviated from that. Yeah, I think, I don't know whether or not, it would be my argument that her conduct did not result in his death, that simply putting him in the van and driving him from Houston to Los Angeles, he, if he had just stayed at a hotel for the next couple days and not sought out any treatment, he, it sounded like from Dr. Parsons' testimony, he was likely to have died anyway. He would have, he had the, she had the option and the responsibility to do something. I mean, it's a crime of omission. You're saying just because he's in the van, that's not the point. He was almost a prisoner at that point. She wouldn't take him. I mean, you can go to the CVS and leave somebody, and there's a, there's a, can you fix the, hang on, it keeps, it keeps echoing. I'll speak more quietly. So that's the problem I have, is that you can't just say, oh, well, he would have died anyway. I mean, we're all going to die, but this guy was certainly a lot closer to, to death than he should have been under the circumstances. Yes, Your Honor, but was she aware that he was that close to death? That's the, that's the issue that I believe that the jury may have overlooked, and that I would want this court to really take a look at, is that the fact that his pneumonia was not brought to her attention. I mean, he never said anything to her. He, and maybe he felt like he didn't have the right to say anything because he's paying to be smuggled back into this country, so he's just going to keep his mouth shut, but nothing was brought to her attention as to how serious his death was. All right, Ms. Gowdy? May it please the court, good morning, Renata Gowdy for the United States. To answer a question that was asked of opposing counsel about how long the transport was, it was from 7 p.m., that's when they departed Houston, to 5 a.m., and that's when they dumped his timeline of events. At 1.28 p.m., there was a call, they were still in Houston. Muniz called Morales, Jimenez's wife, and asked for the $650 to transport him to, from Texas to California. They depart 7 p.m. Houston time. About 7.34 p.m., Muniz calls Morales and says that he is diabetic and that he needs insulin. So that's pretty early on in the journey. 7.38 p.m., there's another phone call about financial arrangements. At 1 a.m., there's testimony that they were in Wichita Falls, Texas. Then they head west on I-40, and at 5 a.m., they abandon, dump Jimenez in Vega, Texas, on the side of the road. And then, at 8.23 a.m., three and a half hours later, they are in Albuquerque, New Mexico, and that's when Muniz, there's four telephone calls between Muniz and Morales. Three of those calls are initiated by Morales. So she's inquiring about his safety, and that's when Muniz says, at that point, three and a half hours later, that she had him in Vega, Texas. Then the family starts calling around in Texas, trying to figure out, you know, where he is. The authorities find him. There is testimony that Ranger Hood arrived on the scene about 10.30. There were already sheriffs there, and that he was dead at that point. The only testimony that he died, that Jimenez died in the car, comes from Muniz, and that testimony was rejected by the jury, and, in fact, the court found that that testimony was false, and that Muniz had lied under oath, and she imposed a sentencing increase for obstruction of justice. But specifically, Judge Rosenthal didn't say she lied about when, whether he was dead or alive, right? Judge Rosenthal was very careful to say, that could have been true. We just don't know if he died. I thought that was it. I thought she assigned the perjury for the two specific things that he mentioned, the FBI denial and the calls denial. Denying the calls, and denying that. So, therefore, we're just left with an uncertainty that I thought Judge Rosenthal acknowledged, about whether or not Tovar died in the car, or was still alive, and therefore abandoned. Well, I think that the testimony from Acetuno was that he, that Jimenez was unconscious at the time that he was left in Vega, Texas. Now, Acetuno did say on cross-examination when he was pressed, it was like, you know, well, maybe he was dead, and he said something like, I don't know. At sentencing, Judge Rosenthal said, well, you know, if they didn't know, that that really actually didn't, there was no testimony that he was actually dead. It was either that he was unconscious, or maybe they didn't know. And the enhancement for reckless endangerment turned on the fact that they did not seek medical help for him. And then, as a consequence, he died. Yeah. And it was... There's no testimony that the wife said, oh, he's not just diabetic, he's also got pneumonia, and so it's got to be insulin plus antibiotics. No. It was, it was just, she said that he was diabetic, and that he needed insulin. Okay. And that was... The person says he would have lived if he'd been given the combination. I suppose that's a technical argument here, right? Yes. Dr. Parsons testified that the cause of death was actually pneumonia and the diabetes interrelated together, and that treatment for the diabetes would have helped the treatment for the pneumonia. But regardless of whether Jimenez died of pneumonia or diabetes, it was the failure to obtain any kind of medical attention is what caused his death. Muniz testified... Did the jury verdict control that? You didn't argue it much in the brief. You only put that in in one sentence. I think that was... Am I wrong in thinking that a verdict, a jury finding... Yes, that's correct. I think the government's main point in the brief is that the jury found, beyond a reasonable doubt, that during and in relation to the offense, Muniz placed in jeopardy the life of Jimenez and that he died as a result of that conduct. Okay. I mean, it's just a briefing thing. I didn't see... That was one, that was your penultimate sentence, period. Everything else was based on Parsons, which may be fine. I was surprised you, you didn't argue that the verdict controlled the second enhancement, but maybe I'm wrong. Go back and look. Yeah. I think... It's there anyway. The position of the government is that it controlled the reckless endangerment and also the death enhancement. Does it have to be put to the jury or was that just agreed upon by the government defense counsel because it controls statutory maximums? Why was the special verdict? They are helpful often, especially in cases like this perhaps, but do you know? I'm sorry, what was it? Why was this a special verdict? Well, because it was alleged in the indictment, the apprendi factors that increased the statutory maximum. You were asking the jury to decide. So we asked the jury to decide that. There was at the charge conference, Judge Rosenthal, there was a discussion about what kind of connection needed to be made and they made a decision to actually require that the jury find a causal connection between Munez's conduct and the death resulting. So there was actually a jury instruction that was sent to them. The jury had to find those facts. The jury had to find those facts and the jury found them beyond a reasonable doubt. So yes, the government's primary contention is that the jury finding actually controls both sentencing enhancements. I'm sorry, just thinking about that. The first one's a scienter issue, right? Reckless endangerment. Yeah. And so the exact language of the jury verdict had to do with Munez placed in jeopardy the life of Jimenez. And that would be enough for the reckless endangerment based on the facts that happened in this case, which is that Munez saw the hot and cold flashes. She knew from Jimenez's wife that Jimenez needed medical attention, that he needed insulin. And she drove from 7 p.m., certainly 7.34 p.m. when she first heard about the diabetes, all the way to 5 a.m. when they dumped him on the side of the road. They did not call 911. Munez did not leave him at some place where he could obtain medical attention on his own, like a convenience store. There was testimony that there were stores and hospitals all along this route. They went from Houston to Dallas, up Interstate 45, through Wichita Falls, and then west on Interstate 40. And there was testimony that they could have stopped it, that there were convenience stores and hospitals all along the way. They didn't stop there, didn't call 911. Instead, abandoned him on the side of a road at 5 a.m., where the likelihood a reasonable person would think that if you leave an unconscious person on the side of the road early in the morning, there is a substantial risk that the person is going to suffer serious bodily injury or death. And regarding the death enhancement and causation, the jury's finding actually satisfies that causal connection between the conduct and the death. And that is true regardless of whether it is approximate cause or a but for causation. If there are no other questions, then the government asks that the court affirm. Thank you. Thank you. Any rebuttal? You know, what I wanted to address on rebuttal was the fact that she, Ms. Benice took Mr. Tovar, not knowing the full extent of his dilemma, the fact that he had this pneumonia. Now, maybe if she'd known, if he had said something to her and made it known up front that he was that sick, the trip for him would never have started. And so, the whole idea behind reckless endangerment is whether or not there is knowledge that she's putting someone in risk, substantial risk, of serious bodily injury or death, Your Honor. And while this, her behavior was certainly callous, we would argue that is not putting Mr. Tovar in serious risk of bodily injury or death because of the fact that she was not aware of his medical situation being as serious as it was. And certainly, there was a jury verdict or a jury finding, not just a jury verdict of guilty, but a jury finding that Ms. Benice put this man in jeopardy, his life in jeopardy, and then as a result, he died. But it's from the defense standpoint, why the court would put life in jeopardy instead of just tracking the language of this section. If the judge is going to increase someone's punishment six levels because this person is putting them in a risk of serious bodily injury or death, why not track that language? Why not have the jury decide whether or not Ms. Benice placed this man in a substantial risk of serious bodily injury or death? Double jeopardy, it could be argued as that, but it could be argued that it's not the exact same thing. Did you submit a charge with that statement? No, Your Honor. Did you submit a jury charge? No. Excuse me? Did you submit a jury charge? No, Your Honor. Okay. But since that jury charge was not submitted, Your Honor, it is the defense, the appellant's view that a substantial risk of serious bodily injury or death is not going to be the same thing as double jeopardy. Did you object to the charge on those grounds? I do not believe it was objected to, no, Your Honor. But the fact that the jury has found beyond a reasonable doubt that there was jeopardy by Ms. Benice does not equate to a finding of substantial risk of serious bodily injury or death. And then in addition to that, the fact that a death resulted, again, Your Honor, in taking a look at the facts that this is not a strict liability case. Just because someone dies in your care does not mean that you should necessarily be responsible for their death. Even on an intoxication manslaughter case in state court, there's got to be a causation that the intoxication caused the death. So if someone is running a red light when the drunk person is going through in a green, that person's conduct in running the red light caused the death, not the intoxication. In this particular case, Your Honor, which suggests that her lack of he had this pneumonia. But his wife did. Well, she said that he had diabetes, Your Honor, and needed insulin. Right. But when Dr. Carson said if he had gotten the insulin, he likely would have been all right. And Your Honor, that is all true and correct. But they're taking these people from Houston to Los Angeles. Within a couple days, they're going to be there. So Ms. Benice was probably thinking that if they could just get them to Los Angeles where, you know, the family was supposed to be there to pick them up, then they could be able to take care of them at that time, that it was not of such a serious nature that they needed to take them to a clinic, call 911, take them to Walmart, CVS in order to get that medication. I thought there was a medical testimony that that the pneumonia in combination with the diabetes causes death. In fact, yes, Your Honor, that's true that that. OK, so if they're interrelated and when he knows that the person is sick, he knows to the extent that he calls that he calls up Morales. Morales tells him he's got diabetes. He needs this serum. He doesn't go get the serum. Instead, he wants his money. He's still alive after she's told that he needs the serum. And the diabetes in combination with the pneumonia caused his death. And he didn't do anything about getting a serum and left him on the side of the road. Oh, why does not that support the idea that he he won? He knew he was sick, so he knew he was so sick that he called Morales. He was advised about the diabetes and callously. He just didn't do anything other than insisted he get his money. Well, just, Your Honor. She was aware of the fact that he had diabetes, but she was not aware of the fact that he had low bar pneumonia, which was the actual main cause of his death. Certainly, the diabetes is an aggravating factor and would probably hasten the death. But without the actual knowledge of having known that he had the low bar pneumonia, it is still the defense's standpoint that this was not a so you're saying he has to know what's going to kill him. Not just that he has to have enough information that that he is at serious risk of bodily injury. Yes, Your Honor. All right. Thank you. All right. We have your argument. Thank you.